# EXHIBIT A

# IN THE COMMON PLEAS COURT OF SUMMIT COUNTY, OHIO
## GENERAL DIVISION

| | |
|---|---|
| **MICHAEL KENYON INGRAM**<br>1354 Sugar Knoll dr.<br>Bath, Ohio 44333<br><br>　　　Plaintiff,<br><br>v.<br><br>**CROWDSTRIKE HOLDINGS, INC.,**<br>150 Mathilda Place<br>Ste. 300.<br>Sunnyvale, CA 94086<br><br>　　　Defendant. | Case No.:<br><br>Judge:<br><br>**COMPLAINT**<br><br>Michael Kenyon Ingram<br>1354 Sugar Knoll dr.<br>Bath, Ohio 44333<br>Telephone: (330) 581-5624<br>Email: michael.ingram.usn@gmail.com |

I, the undersigned, hereby file the Complaint for damages arising and resulting from discriminatory actions taken by the plaintiff between the period of time between August of 2019 and February of 2021 culminating in loss of income and benefits from wrongful termination on February 2021. In support of this claim, I allege and aver the following:

# **PRELIMINARY STATEMENT**

1. I, Michael Ingram, the Plaintiff, agreed to a contract with CrowdStrike Holdings Inc. ("CrowdStrike", "the Company") in December of 2019 to work as a Technical Editor for the Content Management Team ("Editorial Team", or "Editorial", informally) which supported the CrowdStrike Intelligence organization.

2. I am a disabled veteran of the United States Navy with a health condition documented by health care providers in the Veterans Affairs Administration health system.

3. Facts borne out by documented evidence and temporal proximity show that I was a valued and high-performing team member until the exact date in which I disclosed a medical condition to a supervisor.

4. Subsequent to my medical disclosure, a clear and documented campaign to unfairly disparage my work was undertaken by managers in the Company with the apparent goal of terminating my employment.

5. From the time of my initial hire until November 2020, I was a high-performing employee, earning only high marks on Bi-Annual Reviews and receiving no form of reprimand for performance or for any other reason.

6. On August 12, 2019, Director of Content Management Rebecca Halsey, who was my direct supervisor until that point, was promoted. Justine Petruska, who prior to this time was Ms. Halsey's deputy, was promoted to "Manager Editorial".

7. On August 11, 2020, Ms. Petruska solicited all members of the Content Management team for input on their strengths, weaknesses, interests, and preferred assignments.

8. On August 17, 2020, I sent a substantive and forthright email to Ms. Petruska in response to her request. In this email, I revealed to her that I suffered from a medical condition which I wanted to ensure didn't interfere with my work. Further, I explained that the nature of this condition meant that certain types of duties would be conducive to my success and gave several relevant examples that I had already discussed with Ms. Halsey.

9. Ms. Petruska replied to this email only to say that she would follow up with me later to discuss. Despite several requests on my part, she did not agree to meet until I convinced her to talk with me before our regular Content Management team meeting on September 2, 2020.

10. On August 18, 2020, my Bi-Annual Review for the period of November 2019 through May 2020 was completed. I received a glowing review. Per the General Comments by Ms. Halsey, "I agree that Michael is over-performing in his

current role and would like to recommend him moving to the next level, subject to further discussion with Intel management."

11.     As a direct result of this Bi-Annual Review, I was promoted to Technical Editor II and given a pay raise, as was approved by SVP Intelligence Adam Myers.

12.     On August 25, 2020, Ms. Petruska revealed in a video meeting that my new duties as of 30 August, 2020 would be to edit the Company's CrowdStrike Alert ("CSA" or "Alerts") product as well as the CrowdStrike Daily Report ("CSDR" or "Newsletter"), which were examples that I had described as being a poor fit with my medical condition. In this meeting and subsequently, I expressed my discomfort with this posting on medical grounds. Ms. Petruska brushed aside my concerns and indicated that I had nothing to be concerned about.

13.     On August 31, I received a meeting request from CrowdStrike Director of Employee Experience Lindsay Noennig to discuss submitting a Reasonable Accommodation. This request did not come about from any action on my part, as at that time I had no interest in being treated as disabled by the company.

14.     In the meeting with Ms. Noennig, I expressed my shock and dismay at her request, as the only persons I had disclosed my medical condition to were my direct supervisor, Ms. Petruska, and her direct supervisor, Ms. Halsey. Ms. Noennig stated that it was Vice President of Intelligence Operations Don Ventrice, who was not in my direct chain of command in the company had informed her of

my decision to seek Reasonable Accommodation. I had never discussed my condition with Mr. Ventrice, nor did I ever express to him or any other persons that I wished to seek a Reasonable Accommodation.

15. Mr. Ventrice was not a direct or indirect supervisor for myself, Ms. Petruska, or Ms. Halsey. Ms. Halsey reported directly to Mr. Myers, who reported to Chief Executive Officer George Kurtz. To my knowledge, there is no valid reason that Mr. Ventrice would ever be involved in submitting or approving a Reasonable Accommodation request even if I had requested one.

16. I stated to Ms. Noennig that that my experience to that point had been that I trusted my managers to continue to simply put me in the right position to proceed and that I hadn't even considered the existing relationship to be even an informal request for accommodation.

17. In a follow-up email, Ms. Noennig provided materials on the Disability Accommodation process and offered assistance should I decide to pursue a reasonable accommodation in the future.

18. Immediately after speaking with Ms. Noennig, I sent a message to Ms. Petruska, asking if she had divulged my medical condition to Mr. Ventrice. She admitted that she had forwarded my email to Mr. Ventrice because she was "concerned." I expressed to her my discomfort with this situation as it only aggravated my medical condition to find that a vice president was potentially

scrutinizing me and that she hadn't even taken the time to inform me that she had discussed my situation with someone outside our direct managerial chain.

19. On September 2, 2020, I sent a message to Ms. Petruska requesting to speak by video chat before the regularly scheduled Content Management team meeting so that we could discuss the incident that took place on August 31, 2020, which Ms. Petruska still had not offered any response for. In this brief meeting, Ms. Petruska claimed that her actions were not intended to be harmful, but were a reflection of how "overwhelmed" my email from August 17 had made her feel. She indicated that she had no standing issues with me and that she hoped to work together in the future. I told her that I was also interested in working together in a pleasant and productive way, but that I was still deeply uncomfortable with her actions and that I would appreciate in the future if she would address concerns to me directly, which she agreed to do.

20. On October 30, 2020, I messaged Ms. Halsey to express my concern over a series of emails that I had received from Ms. Petruska which pointed out minor mistakes that I had made, which was a major departure from the way which Ms. Petruska and the CrowdStrike Intelligence had typically communicated, and that while I was still trying to work with Ms. Petruska, I was becoming convinced that she was attempting to create a chain of evidence to justify firing me.

21. I further indicated that while I was open to staying on the Content Management team, I felt that it was prudent to begin to find another position within the company. I mentioned a position that we had previously discussed in passing with the Global Threats Analysis Cell ("GTAC"), that was looking for an analyst who had experience as a writer to help draft intelligence reports.

22. Ms. Halsey indicated that Harley Halsey, who held a managerial position in GTAC, wished me to send over my resume to evaluate me for the position. Ms. Halsey further indicated that another option was to directly assist her with a number of duties that would take me away from direct interaction with Ms. Petruska.

23. At the conclusion of the October 30 chat, I indicated to Ms. Halsey that I would be informing Ms. Petruska about my intention to move to the GTAC only after I had spoken with Mr. Halsey or another GTAC manager.

24. In the week of November 2, 2020, I spoke with Mr. Halsey by video chat to discuss the GTAC position. He indicated an interest in bringing me aboard, pending a discussion with his manager.

25. Subsequent to my conversation with Mr. Halsey, I informed Ms. Petruska by chat that I intended to pursue a transfer to GTAC. Ms. Petruska replied that she'd like to discuss my interest in the position in a video chat that would take place on November 4, 2020.

26.    On November 4, 2020, instead of discussing the transfer, as Ms. Petruska had promised, Ms. Petruska brought Mr. Ventrice onto the call. Mr. Ventrice informed me that my long-term poor performance had resulted in my being placed on a Performance Improvement Action Plan, which expressly threatened consequences up to and including termination if I did not show "improvement" in the 90-day timeframe of the PIAP.

27.    The items cited for improvement in the PIAP were wide-ranging and in opposition to the facts stated in the most current Bi-Annual Review (dated August 18, 2020), which resulted in a promotion and pay raise which was endorsed by SVP Intelligence Adam Meyers.

28.    In this meeting, I mentioned to Mr. Ventrice that the PIAP process was unnecessary, as I was already in the process of trying to move to a new position. Mr. Ventrice stated that now that I was subject to a PIAP, no one would want to bring me on.

29.    Subsequent to this meeting, a transfer to GTAC was never mentioned again by Mr. Ventrice, Ms. Petruska, or any CrowdStrike Manager.

30.    Also in this meeting, I informed Mr. Ventrice and Ms. Petruska that I would be pursuing a Reasonable Accommodation request, as my condition was being used as an excuse to place my employment in jeopardy. I initiated a Reasonable

Accommodation request immediately after ending the call, requesting a return to my previous position working with long-form reporting.

31. Also on 4 November, I sent a chat message to Ms. Halsey about the PIAP. Ms. Halsey indicated that neither Mr. Ventrice nor Ms. Petruska had even informed her of the intent to institute a PIAP and that she would find out more and that we would meet on November 5 to discuss the situation.

32. On November 5, 2020, Ms. Halsey informed me that Mr. Ventrice specifically prohibited her from being involved in the PIAP process and she was unable to intervene or discuss the situation with me. This was very unusual in that not only was Mr. Ventrice not Ms. Halsey's supervisor, Ms. Halsey was Ms. Petruska's direct supervisor. This decision was not within any known precedent nor any applicable company policy.

33. Subsequently, as was required by Company policy, and as I was explicitly mandated by Ms. Petruska, I completed and returned the employee portion of a Bi-Annual Review to Ms. Petruska. Despite inquiring about the status of my Bi-Annual review, I never received a completed copy, nor any explanation of why I was being denied a review that was mandated by company rules.

34. On December 18, 2020, UNUM, the insurance company contracted by CrowdStrike, completed the approval process for a Reasonable Accommodation under the Americans with Disabilities Act. In accordance with this request, my

primary duties were reverted to the long-form reporting which I had been assigned to prior to August 30, 2020.

35. In direct consequence of the extreme and undue stress placed upon me by the Company's unfair and baseless targeting, my medical condition continued to degrade. While I put in my best effort to execute my duties, I noticed an increasing inability to concentrate, which had a direct and negative impact on my work speed and quality.

36. On or about January 21, 2021, I reported to work and found that I was unable to perform my duties. I called Julie Berg, nurse practitioner and my relevant medical provider, to inquire about her willingness to support a FMLA leave request, which she fully endorsed.

37. Immediately after speaking with Ms. Berg, I informed CrowdStrike management and Human Resources that I would be submitting a request for leave under the Family Medical Leave Act ("FMLA").

38. In the period between January 21, 2021 and my subsequent termination on February 26, 2021, my condition continued to deteriorate. In this period, my condition made it nearly impossible to undertake even basic daily activities. I was nearly unreachable by even friends and family members and have difficulty even remembering events from this period.

39. This state continued throughout 2021, severely limiting my ability to find new employment, and still have a substantial negative impact on my health as of the time of this filing.

40. Despite my condition, I did my best to fulfill the requirements that UNUM requested for FMLA leave. I contacted Ms. Berg on more than one occasion to ensure that a medical provider statement was included in my FMLA leave request. Ms. Berg stated unequivocally that she had faxed the statement to UNUM and had received a confirmation.

41. On February 25, 2021, I was contacted by CrowdStrike HR representative Geraldine Reau, informing me that UNUM had not received a medical documentation for my FMLA leave and so had rejected my leave request and that I was expected to be at work at 9:00 AM the following morning, or I would be terminated. I did not see this email until that deadline had passed.

42. When I read the email that Ms. Reau sent the previous day, I contacted UNUM directly. When I asked to speak with the Jacob Rainey, the representative assigned to my case, I was told that Mr. Rainey was no longer with the company.

43. I worked with several UNUM representatives to determine if Mr. Rainey's departure led to my documents being misplaced, but I received no satisfactory answers.

44. Subsequently, I called Ms. Berg, who confirmed that she had faxed the documents twice and documented her actions in the clinic's systems.

45. I replied to Ms. Reau's email explaining that I had provided all documents and expressed my willingness to work with CrowdStrike and UNUM to determine what happened to the documents Ms. Berg had faxed.

46. In a reply, Ms. Reau ignored my offer to resolve the situation and instead insisted that I report to work within the hour or I would be terminated.

47. In a reply to Ms. Reau, I stated that it was not possible for me to show up under the time constrains she demanded, but repeated my willingness to work to resolve the issue.

48. That evening, Ms. Reau informed me that I was being terminated by the Company.

49. On February 5, 2021, I submitted a signed charge of discrimination with the U.S. Equal Opportunity Employment Commission ("EEOC").

50. On June 1, 2022, the EEOC declined to investigate the case and issued a Right to Sue letter.

## THE PARTIES

51. Plaintiff Michael Ingram is a resident of the State of Ohio.

52. Defendant CrowdStrike Holdings, Inc. is a for profit business based in Sunnyvale, California.

## JURISDICTION AND VENUE

53. This court has jurisdiction to hear this matter pursuant to Ohio Rev. Code § 2305.01.

54. This Court is the proper venue for this action, pursuant to Ohio R. Civ. P. 3(B)1, as the Plaintiff resides in and conducted relevant activities in Summit County.

55. Pursuant to Ohio R. Civ. P. 8, Plaintiffs state that the amount in controversy exceeds $25,000

## CAUSE OF ACTION

*Workplace Discrimination Under the Americans with Disabilities Act of 1990*

56. The documented chain of events outlined in this Complaint lay out the Defendant's discriminatory actions which are in violation of 42 U.S.C. § 12112 (a), and 42 U.S.C. § 12112 (b)(1), (3)(A), (4).

57. The causal relationship between the Plaintiff's disclosure of a medical condition is supported by documentation which shows the extreme temporal proximity of adverse employment actions which took place in the immediate aftermath of this medical disclosure.

58. Further, the actions undertaken by managers and officers of the Company, which were arbitrary and in certain cases violation to the Company's own stated policies, demonstrate an attempt to create conditions that could be used as justification to terminate the Plaintiff.

59. The events demonstrated herein show that the Company was in violation of 42 U.S.C. § 12112 (a) by denying "advancement" and "employee compensation", as well as undertaking the "discharge of (an) employee" in its actions to create conditions to fire an otherwise high-performing employment after the disclosure of a medical condition.

60. The events demonstrated herein show that the Company was in violation of 42 U.S.C. § 12112 (b)(1) by "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee" by functionally denying advancement and opportunity to transfer to another position to expediate termination after the disclosure of a medical condition.

61. The events demonstrated herein show that the Company was in violation of 42 U.S.C. § 12112 (b)(3)(A) by unjustly singling the Plaintiff out for "performance improvement" and applying additional and undue standards that were not levied against peers.

62. The events demonstrated herein show that the Company was in violation of 42 U.S.C. § 12112 (b)(4) by denying the plaintiff the opportunity to pursue additional internal job opportunities, despite multiple managers expressing interest in such an arrangement.

63. As a direct and proximate result of the Defendant's actions, the Plaintiff was denied employment and compensation, including but not limited to substantial salary and owed stock options. If not for these actions, the Plaintiff would likely still be employed by the Defendant and would continue to collect these benefits.

64. Further, the Defendant's actions have had a direct and deleterious effect on the health and well-being of the Plaintiff and have interfered with his duties while employed by the Defendant and subsequent employment prospects. If not for these actions, the Plaintiff would likely have been substantially more capable of acquiring and sustaining gainful employment between the period between February of 2021 and May of 2022.

>  **WHEREFORE**, Plaintiff prays that judgment be entered against the Defendant follows:
>
>  1. A judgment against the Defendant in an amount in excess of $25,000 representing contractually promised salary and benefits for a period of five (5) years from the date of termination, which if not for the Defendant's discriminatory actions, would have been earned and paid; and
>
>  2. A judgment against the Defendant in an amount in excess of $25,000, which would represent the maximum value of all stock options revoked upon

CV-2022-08-2974                    CROCE, CHRISTINE      08/30/2022 14:43:11 PM                CMCO

Case: 5:22-cv-01780-JRA Doc #: 1-1 Filed: 10/05/22 17 of 17. PageID #: 23  Page 16 of 16

termination of employment multiplied by the highest daily price of the stock between February 2021 and the judgment of this case; and

3. Interest, costs and reasonable attorney fees associated with these legal proceedings; and

4. For such other and further relief as the Court deems just and proper.

                                      Michael Kenyon Ingram

                                      _____

                                      Plaintiff

*Sandra Kurt, Summit County Clerk of Courts*